[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, Dominic and Theresa DiBiaso, brought this civil action for damages against the defendants, Charles Gargiulo and Carol Gendron. The defendants were tenants of the plaintiffs at 38-40 Center Street, second floor, West Haven, Connecticut. The complaint was brought with two counts: count one is a claim that back rent is due, and count two is a claim for damages to the second floor apartment.
The defendants, who represented themselves pro se, deny that any back rent is due and deny the damages claimed, save one aspect. They filed a counterclaim claiming that the premises were unhabitable and unsafe and in violation of 47a-4a and47a-7 of the C.G.S. during the tenancy and also claiming that this action is retaliatory because the defendants reported violations to the Bureau of Inspection in July of 1990. The defendants also claim that the plaintiffs were unjustly enriched by the rent accepted from the defendants while the premises were unhabitable and therefore request damages, in essence, the return of that rent and all fees and costs incurred in defending this action and such other relief as may be equitable. The plaintiff denies the counterclaim and offers by way of special defense that all alleged violations were either promptly remedied or caused by the defendants. The plaintiffs filed a motion to strike a portion of the counterclaim, alleging a cause of action for vexatious litigation, and that motion was granted by Judge Vertefeuille.
The court took extensive testimony in this case and the parties requested and filed briefs at the conclusion.
The plaintiffs rented the second floor apartment to defendant Carol Gendron on April 28, 1991, for $250.00 a month under an oral month-to-month agreement. Utilities were not included. In April of 1989, the rent was increased to $450.00 a month until they moved out July 31, 1990. Defendant Charles Gargiulo moved into the apartment in November of 1988. The plaintiffs live on the first floor of the building. Both parties have had pets during the period of this tenancy.
There was testimony by a master electrician, Mr. Alexander Stamatien, of over 40 years, that he did update the electrical CT Page 6723 system at the premises in August of 1990 upon the request of the plaintiff who had been notified by the City of West Haven, Connecticut, Bureau of Inspection, by letter of August 1, 1990 (Defense Exh. 8), of a complaint by defendant Gendron of electrical and other housing code problems on the premises. He testified that the electrical system had probably been installed 50 years prior under prior codes and the housing code people wanted them to update it to the present day code. He said he had to revise the pull chains and install wall switches, additional outlets, GFI outlets in various rooms, a meter for the halls, and appliance circuits. He testified that the conditions in the house were safe and he viewed the problems as "technical violations". He testified that the wiring that was in the building was well maintained. He said the apartment was not a point of contention by the housing code inspector and that it had been in compliance. He worked on problems in the basement primarily. He testified that electrical wires can have a black spot as the result of an are due to a short circuit.
Ms. Evon Mastej, a neighbor of the plaintiffs for the past four years, since May of 1988, offered photos of a bridal shower on June 18, 1988, to show the condition of the apartment at that time, which she said was in very good condition. Ms. Gendron was to be her maid of honor. The photos were not particularly helpful to the court. In August of 1989, when she was pregnant, she testified to an incident of fleas in her home she testified was brought in by the dogs of the sons of the defendants. One son, Jason Gargiulo, told her that his dog had fleas. She testified to another incident around the time the defendants were moving out that involved a dog she was watching for a friend on the porch of 38-40 Center Street that became infested with fleas from inside the house. She testified that the plaintiffs had three dogs that stayed outside. There was testimony that the plaintiffs and defendants also had indoor pets. She testified she viewed the premises after the defendants left and noticed the large window being blocked over by the plaintiffs in the kitchen. She also noticed problems in the ceiling. She testified to a physical altercation with Ms. Gendron over the noise coming out of their 38-40 Center Street apartment.
The plaintiffs produced at trial Richard Amendola of Amendola Services, who performed some repair work in 1990 and submitted on November 11, 1990 an estimate of $4,232.50 (Plaintiffs' Exh. B) and a bill of $2,922.50 of December 29, 1990, for work completed on that estimate (Plaintiffs' Exh. C), CT Page 6724 which was paid by the plaintiffs. With regard to the estimate, item (1), he testified he installed the missing light fixture in the sun porch. He charged $90.00 for that work. He had bought the light fixture as a part of that cost. There was only a light bulb there when he gave an estimate.
With respect to item (2) of the estimate, he testified that Mr. DelBuono, the previous contractor, had sheetrocked, taped and primed the ceilings in the front room, dining room and sun porch. He then testified he finished the work by painting those ceilings and charged $330.00.
With respect to item (3), he testified he installed a fan and a light fixture in the dining room. He charged for labor only and that charge was $125.00. With respect to item (4), he said no prior work had been done on the floors under this item and he testified that the floors were scraped and scratched and the finish was worn off and that there were water or urine stains which discolored the floor. He could not testify based on any test as to what kind of finish the floor had before he got there. He believed it had been polyurathaned. He said that was the first time he ever came across urine on a floor. He said there was an odor of urine. He said there were water stains near the radiators. He also testified that he could tell, based on working on 12 floors over the last 4 years, the difference between urine and water stains by the different type of coloring and odor. The court did not credit his testimony on the urine stains because of his lack of experience. He sanded the floor, stained the floor, and finished the hardwood floors in the entire apartment. Some parts of the discoloration from the stains he could not get out. His estimate was for $1,462.50, but he took off $200.00 because he only put one coat, instead of three as estimated, of polyurathane over the floor. That left a charge of $1,262.50.
With respect to item (5), he testified no prior work had been done in the kitchen. He testified that there were drawers missing in the kitchen cabinets and there were scratches on the cabinets and the wood finish was all scraped, so he installed new kitchen cabinets, countertop and backsplashes. He charged for labor only $450.00.
With respect to item (6), he testified that there was a broken door ripped off the hinges on the vanity and that he charged $220.00 to install a new bathroom vanity and top. CT Page 6725
With respect to item (7), he has not done that work yet. He testified that there was a need to repair the holes in the wall, repaint and wallpaper over that.
With respect to item (8), he replaced the door to the sun porch for what appeared to be extensive scratches on the door by a dog. He charged $265.00. The defendants agreed to this item.
With respect to item (9), he testified there were still fleas there and he couldn't work with them there and so he exterminated once and that cost $180.00.
With respect to item (10), he testified he has still not repaired lattice under the front porch.
Mr. Anthony Finelli, the West Haven Housing Code Inspector, testified that he sent the letter of August 1, 1990, regarding violations at the premises to Ms. DiBiaso. He testified that the violations for illegal work were in the basement and not in the apartment. His testimony was quite confusing. He testified there was some new wiring in the basement without the benefit of a proper permit. He testified there was some new wiring in the kitchen. That wiring was not addressed in the violation letter. However, he testified that he had checked his file and found that no permit had been taken out to do the wiring in the kitchen. Then, he testified, that he didn't know for certain whether or not there were permits taken out for the electrical work shown in defendant's exhibits 2 through 6, including the kitchen wiring. He said permits were taken out later, after his letter. He also testified that the violation in his August 1, 1990 letter regarding the closing in of two windows without a proper permit was in the kitchen of the second floor apartment. He testified that he does the pre-inspection and the letter of violations and then specialists under his supervision — the building, electrical, and plumbing people go out and determine what needs to be done and how serious it is.
The plaintiffs offered the testimony of Mr. Simon DelBuono, a person who has been active in the construction business for about 25 years, from the PJR hearing on October 17, 1990. He has since gone out of business and was not available at the time of trial. His transcript, which was introduced without objection, related to his inspection of the premises and his cost estimate of the repairs that needed to be done. The defendant introduced CT Page 6726 Mr. DelBuono's August 6, 1990 estimate of $4,267.00 in repair costs into evidence. This court did not have the opportunity to view first hand Mr. DelBuono's credibility.
Mr. DelBuono testified that when he viewed the premises to determine his estimate regarding item (1) of his estimate (Defense Exh. 13), the front porch had slats missing or slats in need of repair. He estimated that cost as $380.00, some of which was still to be done. He testified that he repaired broken slats. He ultimately could not testify as to specific costs of materials used.
With respect to item (2), regarding replacing missing light fixture in ceiling on sun porch, he testified he did the ceiling in the sun porch but the light fixture is not done yet. He said the light fixture was taken down and he had to replace it. He said his cost for this item will be $175.00, although he testified that he didn't include the painting of the ceiling in that cost.
With respect to his item (3), regarding repairing holes in the ceiling in the front room and paint, he testified that he repaired "tons" of "big holes" in the front room, and that he painted them. He testified he had to take out ceiling tiles because of a big bow in the ceiling and then sheetrock the ceiling. His cost is $275.00.
With respect to his item (4), regarding repair and painting of the entire ceiling where improperly installed fan and light fixture caused damage, he stated that the ceiling has been fixed but the fan is not back up yet. He said somebody had a fan there and it did an "extensive amount of damage to the ceiling." He testified that to install a light you need a box in the ceiling but with a fan because of all the "whipping around" to be installed right it needed a bar to hold it. He said there was no bar, only a box and the box was hanging and everything. He said the fan loosened everything up so I had to take most of the ceiling tiles down and repair most of the ceiling. He said he couldn't use the tiles he took down. He sheetrocked about 60-70% of it, taped it and sheetrocked it, and sand-finished it all, including the remaining ceiling tiles. Originally, it was tiled without paint and sand finish. He did not see a light fixture for that ceiling. When he got there, the only thing that was hanging was the wires, a big box and all the slats were coming down. He also did not see the fan. He said his cost for the CT Page 6727 paint and the whole new ceiling is $1,150.00.
With respect to item (6), regarding repair of plaster and wallpaper in front hallway, he testified that part of the hallway was damaged and he has to repair those holes in the front hall and repaint and wallpaper it. He said there are big holes, extensive holes and a big sheet of wallpaper is missing. He has fixed all the holes. He planned to paint trim and banister and repair wallpaper. His cost is $680.00.
With respect to item (7), regarding extermination for flea infestation, he stated there were "fleas and stuff", so we went in and sprayed it "several times." He testified he couldn't have any of his employees working there because they were getting all fleas all over them. That cost was $275.00.
With respect to item (8), regarding sand and stain all hardwood floors to remove pet stains, he stated that there was a "terrific" amount of stains on the floors — on every one of the floors throughout the whole house. He testified he knew these were pet stains because they were urine stains that smelled. The stains also had scratches like somebody had nails going across it. He also testified to water stains near the radiator. He said these were oak floors. He said oak floors fade from age, water and urine. He testified that it could take 5-6 years, 8 years, 10 years, to wear off a urethane finish on a hardwood floor — "no time limit, no age limit, it's how much abuse it gets." He testified to a lot of stains on the floors — because some places of the floor have finish and some places don't. He testified that urine, water, and abuse caused the stains. He had not done that work yet because he worked on getting the ceilings done.
He also testified that he had viewed this apartment before the defendants moved in and he didn't see any of these problems. He recalled that he went through the apartment when a policeman was the prior tenant. Mr. DiBiaso also testified that the prior tenant was a policeman with a number of children.
The plaintiffs and defendants and part of their families all testified extensively. There were numerous photos admitted. Some photos matched the testimony of the contractors and some didn't. It is clear to the court that there is much hostility between the parties. The plaintiffs are angry the defendants contacted code enforcement and the defendants are angry that the CT Page 6728 plaintiffs are pursuing their damage claims. The court has reviewed the many days of trial testimony and evidence admitted.
Plaintiffs' Rent Claim
The plaintiffs and defendants in their briefs discussed testimony they presented to this court regarding the July 1990 rent. The plaintiffs testify that the defendants owe $200.00 of the July 1990 rent and the defendants claim that they paid $200.00 in cash to Mrs. DiBiaso on or before July 10, 1990. The burden of proving damages is on the party claiming them. Expressway Associates II v. Friendly Ice Cream Corporation of Connecticut, 218 Conn. 474, 476 (1991). The standard for that proof is to prove each claim by a fair preponderance of the evidence. Based on all the evidence before the court, the plaintiff has not met its burden on this claim.
Plaintiffs' Damages Claim
C.G.S. 47a-11 sets out the tenant's statutory duties, of which the most general is the duty to "not wilfully or negligently destroy, deface, damage, impair or remove any part of the premises or permit any other person to do so," C.G.S.47a-11(f). The tenant is thus liable for wilful or negligent property damage.
Since tenant liability must be based on wilful or negligent conduct, the mere fact of damage does not necessarily make the tenant liable. Proof of property damage requires evidence. The landlord bears the burden of proof on all elements of a damage claim. This means that the landlord must prove that (a) the damage occurred, (b) it exceeded normal wear and tear, and (c) it was caused by the tenant, Kulenski v. Siclari, NH-539 (1990); Stutz v. Andren, SNBR-381 (1992); Lurie v. Baker, NH-499 (1990); Pilagin v. Michalski, H-603 (1985). Damage may be shown either by direct evidence or circumstantially. However, a tenant is not liable for damages that already existed when he moved into the apartment or for damage which occurred after he vacated, Wareck v. Connecticut Chair Car Co., NH-557, 6 CSCR 713 (1991); Slaughter v. McFarlane, NH-583 (1992). Similarly, he is not liable for damage caused by persons for whom he is not responsible.
The tenant is also not liable for what is usually described as "normal" or "reasonable" wear and tear, Dell'Oro v. Kelly, CT Page 6729 SNBR-384 (1992); Grzewinski v. George, H-930 (1989); Opinion of the Attorney General, 6 CLT #38, p. 19 (1980). The determination of what is wear and tear, as distinct from what is property damage, is heavily dependent on the facts of the particular case; but in general it refers to deterioration of or damage to the property which can be expected to occur from normal usage. For example, the tenant is not liable for wear to a landlord-provided carpet which reflects normal usage of a rug. On the other hand, the tenant may be liable for the cost of cleaning a rug which has become urine-stained because of the tenant's dog, Toczydlowski v. Nicolaedis, NH-223 (1984).
Wear and tear also includes normal repainting and cleaning which occur at the end of a tenancy. The tenant is not liable for nail or pin holes in a plaster wall which would ordinarily be spackled as part of a routine repainting, Bronzi v. Barone, H-533 (1984); Pilagin v. Michalski, H-603 (1985). Each claim must be evaluated on its own merits, in light of the general principle that some wear and tear is inevitable in rental property.
The landlord must also establish sufficient evidence of the amount of the damage to remove a judgment from the area of speculation. This will not ordinarily require expert testimony or appraisals, but it does require the presentation of some evidence from which a court can make a reasonable estimate of the amount to be awarded, Clarke v. Mele, SNBR-372 (1992); Collazo v. Dias, NH-555 (1991).
Property damage may be measured by repair cost or by value, as appropriate. Replacement cost is not usually allowed. Thus, if a tenant has destroyed or removed a landlord-provided carpet, the tenant's liability must be adjusted for the age and condition of the carpet, since the tenant is liable only for lost value, Nitch v. Lavoy-Alaimo, H-977 (1992); Bonito v. Lawrence, NH-576 1992).
The dollar value of damage may be shown by paid bills or estimates, DiNapoli v. Doudera, 28 Conn. App. 108, 609 A.2d 1061
(1992), Wyatt v. Ghosh, SNBR-366 (1992), but the courts have held that paid bills are more credible. Evidence that the apartment was subsequently rented to another tenant without repairs being made may reduce the credibility of a claim that damage occurred or that it was of substantial impact, Dell'Oro v. Kelly, SNBR-384 (1992). If damage is repaired as part of a larger repair or improvement job, the tenant is liable only for the portion of the CT Page 6730 repair caused by his negligent or wilful conduct, and the landlord's evidence must provide a method by which the court can determine how much to allocate against the tenant, Sippin v. Ellam, SNBR-338 (1989); Strofolino v. Bordeau, NH-531 (1990). While the court should not impose an unreasonable burden of proof, judges handling property damage claims in landlord-tenant cases have traditionally sought to make sure that such claims are legitimate and that the amount claimed as damages is not inflated, Bonito v. Lawrence, NH-576 (1992).
The plaintiffs are pursuing their damages claim based on Mr. Amendola's estimate and bill. They have not paid Mr. DelBuono's bill. They are not requesting payment from the defendants based on any payments to Mr. DelBuono. The court makes particular mention that this tenancy ran for over 9 years and there is to be expected a certain amount of wear and tear.
Based on all the testimony and evidence presented, and working from Mr. Amendola's estimate (Plaintiffs' Exh. B), the court finds that the plaintiffs have met their burden of proof on the damages claimed as follows:
Item
(1) missing light fixture $ 0
 (2) Paint ceilings in Front Room, Dining Room and Sun Porch — 0
 (3) Install Fan and Light Fixture in Dining Room (Labor only) 125.00
 (4) Sand, stain finish hardwood floors in entire apartment (based on the age of the tenancy for reasonable wear and tear, and the stain and rug damages caused by defendants) 200.00
 (5) Install kitchen cabinets, countertops and backsplashes (Labor only) (% for scratches, and missing and broken parts) 100.00
(6) Install bathroom vanity and top CT Page 6731 (% attributable to defendants for broken leg) 60.00
 (7) Repair and prepare walls in stairway and paint (% reduced for depreciation for age of wallpaper) (defendants are responsible for their agents) 100.00
(8) Replace door to sun porch 265.00
(9) Spray apartment for removal of fleas 180.00
 (10) Repair lattice under front porch (% attributable to defendants and depreciation) 60.00
Total $ 1,090.00
Defendants' Counterclaim
The essence of the defendants' counterclaim in paragraphs 4, 5, 6, 7 and 8, is that they should be excused from liability because the rental premises were not fit for human occupancy in violation of the landlord's responsibilities, pursuant to Conn. Gen. Statutes 47a-7, to maintain fit, sanitary and safe premises. They allege in their counterclaim that, under Conn. Gen. Statutes 47a-4a the landlord cannot accept rent when the premises are uninhabitable. In their brief, they state that they agreed to $450.00 per month in April of 1989, but in the next four months the plaintiffs started their remodeling projects that were never finished while they were living there and therefore they didn't bargain for that rental for the way the apartment looked. Additionally, they cite the alleged electrical "fire" or "arc" approximately two months before they left and Ms. Gendron's subsequent complaint to City officials and Mr. Finelli's August 1, 1990 violation letter as grounds to excuse liability for rent. However, at the same time the defendants state that they always paid rent and that they paid rent for July 1990, so they are not alleging that they withheld any rent due to these problems. Additionally, the defendants, who had a month-to-month tenancy, did not testify that they sought to invoke any of the other remedies available to them under the law, such as provided in47a-13 in the provision of essential services, or in 47a-14h by a payment-into-court action. Defendants did testify to the various improvements they made to the premises for which they CT Page 6732 offered no bills or estimate of values and for which they stated they had not sought nor were they reimbursed by the landlord.
 "Whether there has been such interference with the tenant's peaceful enjoyment of the premises as to render the leasehold untenantable cannot be determined by general principles but depends instead on an "inquiry in every instance [into] the facts of the particular case. By this is meant the situation of the parties to a lease, the character of the premises, the use to which the tenant intends to put them, and the nature and extent by which the tenant's use of the premises is interfered with by the injury claimed." (citations omitted) (emphasis added)
Conference Center Ltd. v. TRC, 189 Conn. 212, 221 (1983).
To be successful a tenant must demonstrate actual and serious deprivation of the use contemplated by the parties to the lease. Conference Center Ltd., supra, at 221.
There is no question that the defendants and their children were inconvenienced, that there were problems they did not bargain for, and that the City officials did find in late July or early August 1990, at the time the defendants were moving out, what were called "technical" violations of the codes. There is also evidence that the landlord made repairs when they were called to his attention. However, the court has reviewed the case law in this area and finds that the violations must be substantial and a serious deprivation to health and safety for there to be grounds for a rent abatement of any sort.[1] That type deprivation has not been made out and, therefore, the defendants have not met his burden of proof on the counterclaim.
Accordingly, judgment shall enter for the plaintiff on the complaint in the amount of $1,090.00 and for the plaintiffs on the defendants' counterclaim.
Clarine Nardi Riddle, Judge CT Page 6733